Bergan, J. (dissenting).
The decision of the board reviewed in this proceeding superseded the arrangement which the Governor had made for discussions with groups of. State employees. The Governor’s budgetary powers under the New York Constitution (art. VII, § 1) are broadly framed.
In construing the statute creating the Public Employment Relations Board (L. 1967, ch. 392; Civil Service Law, § 205), the court must read in it no purpose by the Legislature to impair the Governor’s budgetary powers since, if those powers were adversely affected by the statute, it would be constitutionally invalid.
The Governor’s executive budget, as the Constitution provides in express language, must include a "complete plan ’ ’ of expenditures (cf. People v. Tremaine, 281 N. Y. 1). It is difficult to conceive of the arrangement of any such complete fiscal plan, which necessarily includes all State salaries, without implicit authority in the Governor to arrange the groups and sizes of groups of employees of the State which will discuss with him or his representatives their relation to the ‘ ‘ complete plan ” he must propose under constitutional duty.
The State of New York, intervening as a party in the proceeding, submits in this court that although the Governor’s determination of a general unit was “ overturned ” by the board, his decision was right and well-founded.
The process of “ negotiating ” with public employees in money matters, which as a practical matter in labor relations means most of what negotiating there is, like all other questions depending on State expenditures, is under the Governor’s sole initial control. The budgetary result, whatever it may be and whoever may play a part in suggesting it, must be determined in the first instance by the Governor, and no one else, and be submitted by him to the Legislature.
It is to be assumed, then, that the Legislature’s intention to keep within constitutional limits was indicated when, in the statute establishing the Public Employment Relations Board *845 as an agency in the Department of Civil Service, it stated as a matter of policy that it was creating the hoard “ to assist in resolving disputes between public employees and public employers ” (Civil Service Law, § 200). A duty to “ assist ” constitutional officers does not connote a power to supersede them.
Nothing in the statutory language, which begins with the word “ assist ” in the statement of policy in section 200 and proceeds on to the power to “ define ” representative units of employees for the purpose of negotiations (§ 207), suggests that it was intended the board could undo arrangements for representation made by the Governor or to “ overturn ” them, in the language of the State’s brief summarizing the decision of the board’s Director of Representation.
The conflict of power which could occur and here did occur is left unresolved by the statute and a court must resolve such a conflict in favor of constitutional officers and against officers created by statute.
But if the power clearly existed, its exercise in this case is arbitrary as a matter of law on the present record. It has no rationally demonstrated basis in the total statutory criteria according to which the board must function. There are three standards by which the board must act under section 207.
All three must be complied with. For the purpose of this discussion the first two dealing with “ community of interest ” among employees and the power of officials to agree on terms of employment, may be left aside since even if these are met and the third is not met, or its resolution is arbitrary, the determination cannot stand.
The third criterion which must be considered in defining a unit is that it “ shall be compatible with the joint responsibilities of the public employer and public employees to serve the public ’ ’ (§ 207, subd. 1, par. [c]).
There is no base in the record-^o support the view of the board that its larger number of units is'better suited, i.e., more ‘ ‘ compatible ” with the “responsibilities” of the State and its employees to “ serve the public ’:’ than the general unit fixed by the Governor. On the contrary, this record demonstrates strongly the decision by the board is less compatible with that responsibility and is potentially harmful to the public service and, therefore, arbitrary.
*846 The arbitrary nature of the determination is made manifest in this respect by the rationalization in the board’s decision dealing with this responsibility to serve the public. It is worthwhile to read it in text: “We believe that the statutory criteria that ‘ the unit shall be compatible with the joint responsibilities of the public employer and public employees to serve the public ’ (Civil Service Law, § 207 [c]), requires us to designate negotiating units which provide the employer with a comprehensive and coherent pattern for collective negotiations. Moreover, we believe that this statutory standard requires the designation of as small a number of units as possible consistent with the overriding requirement that the employees be permitted to form organizations of their own choosing to represent them in a meaningful and effective manner.”
It is not easy to see just what a “comprehensive ” and “coherent pattern” for “collective negotiations” has to do with “ joint responsibilities ” of the State and its employees. The statute was here obviously dealing with the obligation of public employees to render good public service and not with their “ patterns ” of labor negotiations (§ 207, subd. 1, par. [c]).
The next sentence is even more puzzling and irrelevant, i.e., that “ this statutory standard ” [for responsibility] “ requires the designating of as small a number of units as possible”. This means, as one would normally read it, that a large unit would provide better public responsibility than several small units.
But the board was in the process of substituting the Governor’s general unit for five small units of its own creation. The rest of the words of rationalization “ consistent with the overriding requirement that the employees be permitted to form organizations of their own choosing to represent them in a meaningful and effective manner ’ ’ are not readily to be accorded relevance to the question of public responsibility to which they purport to be directed.
The result is that the board has not in this area demonstrated a rational basis for superseding the Governor’s arrangement of appropriate negotiating units related to joint responsibility to serve the public. All that the board shows is that it has a different philosophical view from the Governor in this issue. That is not enough.
*847 The classic judicial test in a mandamus-type review for this kind of determination, involving the exercise by a public agency of judgment in the area committed to its discretion, was stated by Haight, J., in People ex rel Lodes v. Department of Health (189 N. Y. 187, 194). It is whether the determination is “ arbitrary, tyrannical and unreasonable, or is based upon false information ”.
The court, applying these or similar standards, has not hesitated to annul determinations which could be seen to have been rationally unsupported or arbitrary (Matter of Missouri Realty Corp. v. New York State Liq. Auth., 22 N Y 2d 233; Matter of Sled Hill Cafe v. Hostetter, 22 N Y 2d 607; Matter of Levine v. New York State Liq. Auth., 21 N Y 2d 1029; Sleepy Hollow Val. Comm. v. McMorran, 20 N Y 2d 190; Stevens v. Town of Huntington, 20 N Y 2d 352; Matter of Forman v. New York State Liq. Auth., 17 N Y 2d 224; Matter of Nationwide Life Ins. Co. v. Superintendent of Ins., 16 N Y 2d 237; Matter of Matty’s Rest. v. New York State Liq. Auth., 15 N Y 2d 659; Matter of Mandle v. Brown, 5 N Y 2d 51; Matter of Tracy Development Co. v. Maltbie, 283 N. Y. 500).
Rationalization of the kind which the board has indulged in this decision is not rationality which has been the common ground for the acceptance of administrative determination by the court.
It was emphasized in the present argument that the board here acted with some special kind of “ expertise ”. No such expertise is demonstrated in this record as might, for example, be shown in rate making by Public Service examiners or engineers. The board members have shown no experience by dealing in any place of responsibility with a unit of government of the size, complexity and constitutionally prescribed fiscal structure as the New York State government; and, indeed, only the Governor and his predecessors, the budget directors and officers of the Legislature’s fiscal cornmittees have had any such experience. The State as an employer is unique.
One of the board members in a current publication concludes that “ [t]he policies of the PERB obviously do not constitute an inflexible or unchanging approach to the question. Experience will be a teacher; undoubtedly there will be changes as a result of the lessons taught by experience ”.[1] The judgments *848 of experienced public officials ought not be cast aside while new officials are gaining experience in the field.
Finally, if the text of the statute, that in the “ definition ” of units there must be compatability with the duty of the employees to “ serve the public ” be kept in mind, the present decision indicating the direction of the board’s policy, and as disclosed in an affidavit in the record, rendered at a time when some employees were on a strike against the State, creates an atmosphere of-grave danger and uncertainty in the State’s labor relations.
All this does not suggest that the board’s policies and proceedings will -help the State avoid strikes, as the statute requires, or promote the “ joint responsibilities ” of the State and State employees “ to serve the public ”. The determination runs against the purpose of the statute; it is arbitrary; it should be annulled.
Order affirmed, etc.

. Crowley, Joseph. R., The Resolution of Representation Status Disputes under the Taylor Law, 37 Fordham L. Rev. 517, 534 (May, 1969).